# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THE NEW MEXICO OFF-HIGHWAY
VEHICLE ALLIANCE,

      Petitioner,

v.                                      No. 12cv1272 WJ/GBW

UNITED STATES FOREST SERVICE
An agency of the United States
Department of Agriculture; THOMAS
TIDWELL, in his official capacity as
Chief of the United States Forest Service;
MARIA T. GARCIA, in her official capacity
as Santa Fe National Forest Supervisor;
GILBERT ZEPEDA, in his
official capacity as Southwestern Region
Deputy Regional Forester; UNITED STATES
DEPARTMENT OF AGRICULTURE; and TOM VILSACK,
in his official capacity as Secretary of the
United States Department of Agriculture,

      Defendants-Respondents, AND

CENTER FOR BIOLOGICAL DIVERSITY,
INC.; WILDEARTH GUARDIANS; and
SIERRA CLUB,

      Defendants-Intervenors

## MEMORANDUM OPINION AND ORDER
## DENYING PETITION FOR REVIEW OF AGENCY ACTION

      **THIS MATTER** comes before the Court upon the Petition for Review of Agency

Action, filed December 10, 2012 (**Doc. No. 1**). Having considered the parties' briefs, argument

presented at the hearing held on July 17, 2014, and the applicable law, the Court finds that

Petitioner's request for review of agency action is not well-taken and, therefore, is DENIED.

**Background**

The final agency action to be reviewed in this case is the United States Forest Service's action implementing the Record of Decision for Travel Management on the Santa Fe National Forest ("SFNF"), signed on June 12, 2012, by Defendant Maria T. Garcia.  See Administrative Record ("AR") 036926.   Petitioner is the New Mexico Off-Highway Vehicle Alliance ("NMOHVA").  Its members are of off-highway vehicle enthusiasts based in New Mexico.  The United States Forest Service is named as a Defendant as well as various officials who participated in the decision at issue.  These Defendants shall be referred to collectively as "Federal Defendants".  Finally, the Center for Biological Diversity, the Sierra Club, and the WildEarth Guardians (collectively referred as "Intervenors") intervened in this matter to support the Federal Defendants' decision.  See **(Doc. No. 47)**, entered January 30, 2014, Order Granting Motion to Intervene.

The fundamental dispute in this case centers on the use of the SFNF by motorized vehicle operators.  While the agency's decision also affected highways running through the SFNF, this litigation focuses on non-highway trails.  The SFNF is located in northern New Mexico and encompasses over 1.5 million acres of public land.  The SFNF is also the habitat for a number of endangered and threatened species including the Mexican Spotted Owl (threatened) and the Southwestern Willow Flycatcher (endangered).  Prior to the final agency action at issue in this matter, the legislation governing motor vehicle use in the SFNF was the Santa Fe Forest Plan enacted in 1987.  The Santa Fe Plan was amended several times since its enactment, but remained largely unchanged over the last thirty years.  Under the Santa Fe Plan, areas were presumptively open for motorized use and motorists could travel anywhere in the SFNF unless specifically prohibited.  See AR000242.  There were certain areas that were closed under the

Santa Fe plan, but NMOHVA estimates that approximately 7,832 miles trails were open and available for use.

In order to address concerns that overuse of motorized vehicles was damaging lands in national parks and national forests, the Travel Rule (36 C.F.R. § 212, et seq.) was enacted in 2005.  The Travel Rule directs the United States Forest Service to designate trails for use by certain classes of vehicles.  <u>See</u> 36 C.F.R. § 212.51.  The Travel Rule "…provides for a system of National Forest System roads, National Forest System trails, and areas on National Forest System lands that are designated for motor vehicle use.  After these roads, trails, and areas are designated, motor vehicle use including the class of vehicle and time of year not in accordance with these designations is prohibited..." 36 CFR 212.50.  In order to comply with the Travel Rule, Federal Defendants evaluated the current structure of the trails authorized for use in the SFNF.  They published their intention to issue a decision about the SFNF, allowed comments, and otherwise followed the notice and comment procedures required by the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701–706m, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.

NMOHVA alleges that Federal Defendants violated NEPA in three ways:

1.      By failing to include a no-action alternative containing the current travel management policy;

2.      By failing to analyze a reasonable range of alternatives; and

3.      By failing to scientifically analyze the environmental effects of the existence of roads and trails, motorized use of roads and trails, and closure of roads and trails to motorized use.

Federal Defendants and Intervenors argue that Federal Defendants did fulfill all requirements under NEPA.

**Legal Standard**

Because NEPA does not include an independent standard of review, courts apply the judicial standard of review governing the APA.  WildEarth Guardians v. United States Forest Service, 668 F. Supp. 2d 1314, 1324 (D.N.M. 2009).   Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).   The Tenth Circuit has explained: "the essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994).  The Tenth Circuit has further stated:

> In the context of a NEPA challenge, an agency's decision is arbitrary and capricious if the agency (1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

> Forest Guardians v. U.S. Fish & Wildlife Svc., 611 F.3d 692, 711 (10th Cir. 2010)

(quotation marks and brackets omitted).

**Discussion**

**I.     NMOHVA has Demonstrated Standing**

Article III of the United States Constitution limits the jurisdiction of the federal courts to cases and controversies.   U.S. Const. art. III, § 2 , cl. 1; Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982).   This

limitation is embodied in the judicial doctrine of standing.  Prospective plaintiffs can establish standing when they can show (1) they have suffered an injury-in-fact, (2) that there is a causal connection between the injury and the conduct complained of, and (3) that the injury is likely redressable by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61 (1992).  A plaintiff bears the burden of proving these elements.  Id.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, 528 U.S. at 181.  "[A]n organization must "submit affidavits ... showing, through specific facts ... that one or more of [its] members would ... be 'directly' affected by the allegedly illegal activity" in order to establish standing.  Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) (citation omitted).

The Supreme Court holds that the injury must be "concrete, particularized, and actual or imminent, not conjectural or hypothetical." See Lujan, 504 U.S. at 559-61 (holding that a plaintiff's assertion that he intended to visit a location "in the future" was insufficient to establish an imminent injury-in-fact from agency action).  Imminence means that the injury is certainly impending.  Id. At 564, n.2.  To avoid having an injury classified as being conjectural or hypothetical, a plaintiff must show that the injury is certainly going to occur within a timeframe that is "reasonably fixed and specific in time and not too far off."  Am. Civil Liberties Union of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1193-94 (11th Cir. 2009).

The Court begins by stating that neither NMOHVA nor Federal Defendants adequately briefed the issue of standing.  In fact, the issue was not raised by either party until Intervenors attacked NMOHVA's standing in their brief.  To establish standing, Petitioner provided the sole

affidavit of Mark R. Werkmeister, a member of the Board of Directors of NMOHVA.   He stated, in relevant part: "As a NMOHVA member, I have recreated on the Santa Fe National Forest using my off-highway vehicle and I plan to return to the National Forest to continue my use in the future."  (**Doc. No. 48-1**), Standing Declaration of Mark R. Werkmeister, ¶ 11.

Intervenors argue the affidavit is insufficient to establish organizational standing, because it fails to demonstrate that Mr. Werkmeister had used any of the areas that were affected by the agency's decision.  NMOHVA's response essentially states that the affidavit is sufficient.  The July 17th hearing on this issue provided little additional illumination.   The Court specifically questioned NMOHVA about the holding in <u>Lujan</u> that "someday" intentions to visit an affected area in the future are insufficient to establish standing.   NMOHVA essentially dodged the Court's inquiry into the <u>Lujan</u> case[1], and selectively applied language from a Tenth Circuit case in order to make it appear as though NMOHVA had met the standard for geographic specificity in its standing declaration.[2]  Federal Defendants provided no more clarity than NMOHVA, as they took no position on the issue.  On the other hand, counsel for Intervenors provided a concise but informative argument that NMOHVA did not state the type of imminent injury required for standing.

---

[1] NMOHVA attempts to distinguish <u>Lujan</u> from the case at bar by saying that <u>Lujan</u> involved a "programmatic change" to agency rules.  This distinction was not material to the standing issue and did not address the Court's inquiry as to <u>Lujan</u>'s holding on the imminence requirement to state an injury-in-fact.

[2] NMOHVA cited <u>S. Utah Wilderness Alliance v. Palma</u>, 707 F.3d 1143 (10th Cir. 2013), where the Tenth Circuit stated, "[n]either our court nor the Supreme Court has ever required an environmental plaintiff to show it has traversed each bit of land that will be affected by a challenged agency action." <u>Id.</u>, at 1155. However, NMOHVA failed to provide the context of that statement.  The petitioner in <u>S. Utah</u> identified several sections of land that were affected by the agency's decision and the Tenth Circuit was simply stating that it was sufficient that petitioner (or one or more of its members) had visited some of the sites even though not all of the sites were visited.  <u>See id.</u>  The Tenth Circuit went on to state "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it" and standing requirements are "assuredly not satisfied by averments which state only that one of respondent's members uses unspecified portions of an immense tract of territory." <u>Id.</u> (citation omitted).  In this case NMOHVA claimed an injury due to Defendants' management of a forest including over 1.5 million acres of land, not even citing a general, let alone a specific area where the alleged injury occurred or is expected to occur.

The Court agrees with Intervenors that Mr. Werkmeister's affidavit attached to the standing declaration is insufficient to establish standing. Mr. Werkmeister's testimony is the very type of "some day intention" that the Supreme Court has found conjectural or hypothetical, and thus insufficient for standing purposes. See Lujan, 504 U.S. at 564; Summers v. Earth Island Inst., 555 U.S. 488 , 496 (finding petitioner did not state an imminent injury when he cited specific projects and areas affected, but merely stated he "want[s]" to go to those locations). Mr. Werkmeister provides no reasonably fixed period of time, let alone a specific period of time, when he plans to return to the SFNF.

Based on the sparse facts alleged in the Werkmeister Affidavit, the Court's initial inclination was to find that NMOHVA lacks standing. However, representations made during the hearing caused the Court to reconsider the standing issue. NMOHVA represented to the Court, and opposing counsel confirmed, that the agency solicited information from NMOHVA and other members of the public regarding motorized trails currently being used in the SFNF. Federal Defendants indicated that they incorporated some of these trails into the final alternatives analyzed in the Final Environmental Impact Statement ("FEIS"). Thus, NMOHVA asserts that by providing the specific trails used in the SFNF, Federal Defendants were put on notice as to the past, present and future pattern of use of SFNF trails by NMOHVA's members. The Tenth Circuit has held that a petitioner can establish a pattern of use of a certain area and state the intention to continue that use in the future to establish imminence. See Southern Utah Wilderness Alliance (SUWA) v. Sierra, 2010 WL 4782976 (D. Utah, Nov. 16, 2010) ("[U]nless there is evidence of repetitious use of each of the specific lands in question, there cannot be a "credible allegation of desired future use" without specific concrete plans, and as such, no immediacy of harm."); see also National Parks Conservation Ass'n. v. Norton, 324 F.3d 1229,

1242 (11th Cir. 2003) (finding imminent injury when plaintiffs stated a pattern of visitation to an area affected by agency inaction, and an intent to continue that pattern of use in the future).  The Court finds, therefore, that NMOHVA has presented in the administrative record a pattern of use sufficient to meet the imminence requirement for standing; but only by the slimmest of margins.

As the Court noted at the hearing, it was disappointed that Federal Defendants were not prepared and thus took no position on whether NMOHVA has standing lawsuit bring this suit.  While the Federal Defendants may have unlimited resources to expend litigating a case such as the one at bar when there is potentially no subject matter jurisdiction, the Court does not have such resources.  Accordingly, the Court hereby gives notice that in future environmental cases involving reviews of federal agency decisions, the Court, sua sponte, will review the issue of standing near the inception of the case in an effort to avoid the situation where the litigants and the Court expend significant time and resources litigating factual and legal issues only to discover that all efforts were in vain because the Court lacked subject matter jurisdiction.

## II.    Federal Defendants did not act Arbitrarily or Capriciously in Analyzing the "No-Action Alternative"

For proposed "major Federal actions significantly affecting the quality of the human environment," agencies must prepare an Environmental Impact Statement (EIS) in which they consider the environmental impact of the proposed action and compare this impact with that of "alternatives to the proposed action."[3]  See 42 U.S.C. § 4332(2)(C).  The EIS is required to include "a detailed statement by the responsible official on . . . the environmental impact of the proposed action and alternatives to the proposed action."  43 U.S.C. § 4332(C).  In order to provide "a clear basis for choice among options by the decisionmaker and the public," an agency's EIS must consider the "no-action" alternative.  See id. (D) (the EIS shall "[i]nclude the

---

[3] There does not appear to be a dispute that the agency action at issue in this matter is the type of action that requires an EIS.

alternative of no action"); 40 C.F.R. § 1502.14.  The consideration of a "no-action" alternative is intended to require that "agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo."   Custer County Action Assoc. v. Garvey, 256 F.3d 1024, 1040 (10th Cir.2001).   The status quo is what would happen if the proposed action (or another one of the alternatives) is not implemented.  See id.

In addition to the regulations implementing NEPA, the Council on Environmental Quality ("CEQ") published in the Federal Register answers to frequently asked questions about the implementing regulations.  See Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations (the "NEPA Guidance"), 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981).   The Tenth Circuit considers the NEPA Guidance "'persuasive authority offering interpretive guidance' regarding the meaning of NEPA and the implementing regulations."  Wyoming v. U.S. Dep't of Ag., 661 F.3d 1209, 1260 n.36 (10th Cir. 2011).  The relevant question provides:

3. Q. What does the "no action" alternative include? If an agency is under a court order or legislative command to act, must the EIS address the "no action" alternative?

A. Section 1502.14(d) requires the alternatives analysis in the EIS to "include the alternative of no action." There are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed. Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting

environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

Where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the "no action" alternative.

In light of the above, it is difficult to think of a situation where it would not be appropriate to address a "no action" alternative. Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. Section 1502.14(c). See Question 2 above. Inclusion of such an analysis in the EIS is necessary to inform the Congress, the public, and the President as intended by NEPA. Section 1500.1(a).

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026-01.

The parties disagree regarding the proper characterization of a no-action alternative. NMOHVA argues that Federal Defendants erred by considering the estimated amount of trails that were actually being used under the current management plan rather than the total amount of trails that could potentially be used under the Santa Fe Plan for the no-action alternative. See (**Doc. No. 34**), p. 8 ("While the current management policy allowed for motorized use on at least 7,832 known legal routes and cross-country travel on more than 821,646 acres, Federal Defendants' Alternative 1 (the no-action alternative)  included only 5,626 miles of legal routes and 443,848 acres."). Federal Defendants argue that they did include a no-action alternative based upon the estimated amount of trails actually being used.  Both Federal Defendants and Intervenors cite to Custer Cnty. Action Ass'n v. Garvey, 256 F.3d 1024 (10th Cir. 2001) in support of their argument that estimated use was the proper benchmark for the no-action alternative.  Custer stands for the proposition that "the current level of activity is used as the benchmark" for the no-action alternative.  Although the cherry-picked line regarding "current

activity" guiding the no-action alternative on its face seems to support Federal Defendants' position, the facts of Custer do not lend such support.

In Custer, the plaintiffs challenged a certain federal regulation governing flights at an Air Force base.  See id., at 1026.  The plaintiffs alleged that the defendants had wrongfully expanded the amount of authorized activity without following the proper procedures outlined in the APA and therefore certain types of activity should not be included as part of the baseline.  The Tenth Circuit rejected this argument and stated that the plaintiffs were improperly trying to challenge past activity.  See id., at 1040 ("The requirement to consider a no-action alternative does not provide a petitioner a vehicle in which to pursue allegations that past [agency] actions received insufficient environmental analysis.  The time has passed to challenge past actions.").  The Tenth Circuit went on to state that because the agency defendants took into account what was actually permitted under the current management plan, there was no merit to the plaintiffs' argument that the existing plan itself was illegal. See id.  Therefore, Custer, undercuts Federal Defendants' argument, because the Custer Court looked to what was permitted under the existing management; it did not consider actual versus permitted use.

The Court finds that the correct measure of a no-action alternative would have been to consider the effect of leaving all of the routes that were currently open under the Santa Fe Plan open.  See Colorado Off-Highway Vehicle Coal. v. United States, 505 F. Supp. 2d 808, 817 (D. Colo. 2007) ("a "no-action" alternative is the impact of "maintaining the status quo. …the status quo was that all trails in this area were closed to motorized use unless marked open.").  In other words, the Court believes that Federal Defendants improperly calculated the no-action alternative.  However, the fact that the agency was wrong about the proper measure for the no-action alternative does not mandate reversal.

"Deficiencies in an EIS that are mere 'flyspecks' and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal." New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 704 (10th Cir.2009). Furthermore, even if an agency violates the APA, its error does not require reversal unless a plaintiff demonstrates prejudice resulting from the error. See APA § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Importantly, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." New Mexico ex rel. Richardson, 565 F.3d at 708. Moreover, even if not compelling, legal interpretations on a matter by administrative bodies having expertise in the area are "helpful" to reviewing courts, Erickson Air Crane Co. v. United States, 731 F.2d 810, 814 (Fed.Cir.1984), and "the courts are to give some deference to the [agency's]informed judgment" on such legal issues. FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 454 (1986). Generally then, when a court reviews an agency's careful and studied conclusions of law pertaining to a matter clearly within the agency's expertise, the court will affirm those conclusions if they are reasonable. See Chapman v. United States, Dept. of Health & Human Servs., 821 F.2d 523, 527 (10th Cir.1987) (agency's interpretation of statute entrusted to its administration limited to whether construction is "reasonable").

Because the Federal Defendants were acting within the scope of their authority, the Court must consider whether they acted in an arbitrary and capricious manner in developing the required no-action alternative. The Court considers the factors listed by the Tenth Circuit for determining whether a decision was arbitrary and capricious by asking did the agency:

> (1) entirely fail[] to consider an important aspect of the problem, (2) offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) fail[] to base its decision on consideration of the relevant factors, or (4) ma[k]e a clear error of judgment[?]

12

<u>Forest Guardians,</u> 611 F.3d at 711.

Here the Court cannot find that the Federal Defendants acted arbitrarily or capriciously in using the "estimated use" as the no-action alternative.  The purpose of the Travel Rule was to minimize impact on the environment from motorized traffic in the national forests.  Federal Defendants undertook an extremely thorough examination of which roads were currently being used in the SFNF in order to determine which roads were causing harm to the environment. They allowed extensive public comment on this issue.  Further, the Court finds the ambiguous and rather confusing language provided in the CEQ guidance about current level of management intensity and current course of action does provide some support for the agency's view of the no-action alternative.   Further, Federal Defendants did actually analyze the *impact* of the status quo. <u>See</u> <u>Custer</u>, at 1040 ("The consideration of a no-action alternative is intended to require that agencies compare the potential impacts of the proposed major federal action to the known *impacts* of maintaining the status quo.") (internal quotation omitted).  Unused roads would not have a significant impact on the environment and thus, would not have been part of the impact of the status quo.  Federal Defendants provided a reasonable interpretation that is entitled to some amount of deference.

Additionally, NMOHVA is arguing an issue of semantics.  Regardless of the actual miles involved in the no action plan, the Federal Defendants did actually consider taking no action and rejected that option.  <u>See</u> AR036514 (noting that Alternative No. 1 is the no-action alternative and would not involve closing any roads that were currently available); AR036688 (Table 45 comparing the effects of where people drive now with where would drive under the action alternatives on soil and water resources); AR036946 (summarizing the decision not to select the no-action alternative).  Further, NMOHVA was not harmed by the agency's definition of no

action, because had Federal Defendants chosen the no-action alternative they would not have shut down any trails, including those trails that were not counted as part of estimated use. Ultimately, Federal Defendants' definition of no action as estimated current use and their calculation of estimated use were reasonable and thus, reversal is not required.[4]

## III.     Federal Defendants Analyzed a Reasonable Range of Alternatives

To achieve the proper analysis the agency must analyze all reasonable alternatives. <u>See New Mexico ex. rel. Richardson v. Bureau of Land Mgmt</u>., 565 F.3d 683, 703 (10th Cir. 2009) ("To comply with NEPA, an agency must 'rigorously explore and objectively evaluate' all reasonable alternatives."). NEPA does not, however, "require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective. What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." <u>Colorado Envtl. Coal. v. Dombeck</u>, 185 F.3d 1162, 1174 (10th Cir. 1999) (quotation marks and citations omitted). The Tenth Circuit directs the Court to employ the "rule of reason" to ensure the agency's final EIS contains sufficient discussion of the relevant issues and opposing viewpoints to enable both it to take "a hard look at the environmental impacts of the Initiative and its alternatives, and to make a reasoned decision." <u>Id.</u>  "The rule of reason guides both the choice of alternatives as well as the extent to which the Environmental Impact Statement must discuss each alternative." <u>Custer</u>, 256 F.3d at 1039-40.  The reasonableness of alternatives and the

---

[4] NMOHVA also argues that because the baseline number used by Federal Defendants (estimated use) was less than the actual available number of trails, Federal Defendants made a predetermination that a certain number of miles of trails would be closed. NMOHVA started with 6,918 miles of roads that could potentially be used under the Santa Fe Plan; Federal Defendants started with a baseline of 5,087 miles of roads actually being used. This is a difference of roughly 26%. If Federal Defendants had chosen the no-action alternative, they would not have enacted any regulations that barred use of any of the existing roads; thus none of those roads would have actually been closed. Accordingly, NMOHVA's argument that about a quarter of the roads allowed under the Santa Fe Plan would be closed no matter which alternative Federal Defendants chose lacks merit.

appropriate range is dictated by the scope and purpose of the proposed agency action.   Id. (stating that NEPA "only requires that reasonable alternatives be evaluated . . . .", and that the appropriate range is determined by "look[ing] first at the intended purpose of the proposed action."); Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209, 1244 (10th Cir. 2011) (explaining that an agency may eliminate as unreasonable those alternatives which do not accomplish its purpose or objective).   The CEQ has provided guidance on the amount of alternatives to be considered:

> 1b. Q. How many alternatives have to be discussed when there is an infinite number of possible alternatives?
> A. For some proposals there may exist a very large or even an infinite number of possible reasonable alternatives. For example, a proposal to designate wilderness areas within a National Forest could be said to involve an infinite number of alternatives from 0 to 100 percent of the forest. When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS. An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness. What constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case.

Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026-01.

Therefore, the purpose and need for agency action must be known before a court determines whether or not the range of alternatives was reasonable.   In this case, the purpose for the agency action is laid out in the Travel Management Rule. 76 Fed. Reg. 68,264 (November 9, 2005).   The purpose of the Travel Rule and its accompanying regulations was to "address concerns about the impacts of unmanaged motorized vehicles use on the National Forest System (NFS) lands.   **(Doc. No. 49)**, p. 12.   As a part of this rule, the Forest Service must designate roads, trails, and areas on national forest lands for motor vehicle use by vehicle type and time of year. Id. (citing 36 C.F.R. §§ 212.50-212.57).   After these are designated on a motor vehicle use

map, any motor vehicle use inconsistent with those designations is prohibited. Id. at §§ 212.50(a), 212.56, 261.13. Furthermore, the Record of Decision developed by Federal Defendants purported to respond to the following needs: 1) the elimination of cross country motorized travel except in designated areas; 2) the clarification of which roads and trails would be open for motorized use; 3) the optional designation of the limited use of motor vehicles within a specified distance of certain designated routes and if appropriate within specified time periods solely for the purposes of dispersed camping or retrieval of a big game animal by an individual who has legally killed that animal; and 4) the development of an amended forest plan direction regarding motorized vehicle use that is consistent with the rule. See AR 36933.

NMOHVA argues that the range of alternatives considered in the FEIS was too narrow to allow for a reasoned analysis of the environmental impacts of the Federal Defendants' decision. It specifically points to the fact that the difference between the alternative with the most miles of trails and the alternative with least miles of trails was only 1,148 miles, or 15% of the 7,832 miles of system and non-system routes under the current management policy. **(Doc. No. 34)**.[5] NMOHVA argues that Federal Defendants chose alternatives with no "exceptionally pronounced" differences which it claims violates 40 C.F.R. § 1502.14. See 40 C.F.R. § 1502.14, "[EIS] should present the environmental impacts of the proposal and the alternatives in comparative form, this sharply defining the issues and providing a clear basis for choice among the options by decisionmaker and the public."). Additionally, NMOHVA asserts that Federal Defendants violated NEPA by considering the effects of the alternatives in a collective manner, rather than individually.

Federal Defendants demonstrate that they did consider a reasonable range of alternatives.

---

[5] See supra for a discussion on the Federal Defendants' no-action alternative. NMOHVA's argument that the Federal Defendants' used the wrong starting point for their analysis bleeds over into their argument about reasonable alternatives. However, as previously noted, NMOHVA's predetermination argument fails.

First, they explain that they considered and eliminated 18 possible alternatives from detailed study. <u>See</u> AR036568-80. Such alternatives included the current management direction (AR036568; <u>see also</u> AR036797-99), as well as a minimalist option called the "Minimum Motorized Access and Recreation Alternative" which would have prevented the designation of any currently-used unauthorized routes or trails for future motorized use (AR036573). The agency eliminated those alternatives which did not meet the purpose and needs of the Rule, leaving it with the six alternatives that were analyzed in greater detail.[6]

Within the 18 alternatives Federal Defendants originally considered, they did in fact consider the full range of miles of available routes and trails (essentially closing no miles to closing all miles of all available trails) requested by NMOHVA. Federal Defendants articulated that they rejected the additional alternatives, because those alternatives did not meet the purpose and needs of the project. <u>See</u> AR036568-80. Federal Defendants were not required to conduct further analysis on these alternatives. <u>See</u> Custer <u>supra</u>.

Further, the Court finds that Federal Defendants satisfactorily analyzed the remaining six alternatives discussed in the FEIS. NMOHVA places excessive emphasis on the lack of variance in the amount of miles. In fact, this is NMOHVA's sole basis for arguing that Federal Defendant did not analyze a wide enough range of alternatives. The alternatives discussed in the FEIS admittedly did not vary greatly in terms of actual miles. However, each of the alternatives contained miles of different routes which addressed unique needs. <u>See</u> AR036541-46 (discussing Alternative 1); AR036546-49 (discussing Alternative 2); AR036550-53 (Alternative

---

[6] <u>See</u> (**Doc. No. 49**), pp. 44-45 (detailing that the five alternatives (with the sixth being the no-action alternative) considered by the FEIS included adding between 37 and 206 miles of unauthorized roads and trails to the system; opening between 53 and 204 miles of currently closed roads and trails for motor vehicle use; closing between 1,776 and 2,552 miles of roads and trails currently open to motorized use; designating between 0 and 32,890 acres for motorized dispersed camping corridors; designating between 0 and 1,093,330 acres for motorized big game retrieval corridors; designating between 0 and 49 acres of areas designated for public motor vehicle use); <u>see also</u> AR036580 (Table 15 "Summary of the proposed changes for each alternative and how they compare to where people drive now").

2M); AR036554-57 (discussing Alternative 3); AR036558-62 (discussing Alternative 4); and AR036562-65 (discussing Alternative 5). The FEIS' discussion of each alternative included a section titled "Features Unique to Alternative" which detailed what features set that particular alternative apart from the other alternatives. Some alternatives catered more towards a specific purpose or need than others. Additionally, Federal Defendants included different types of trails in each alternative. Thus, NMOHVA's focus on the fact that there was not a large difference in the amount of available miles does not tell the whole story regarding the diversity between the alternatives. Contrary to NMOHVA's assertions, Federal Defendants did consider alternatives with "exceptionally pronounced differences."

Moreover, the record reflects that Federal Defendants did not analyze the effects of the alternatives in a collective manner, but rather analyzed the effects that were common to all or some of the alternatives collectively while separately analyzing the effects unique to the individual alternatives. See AR036581-86 (Table 16) (discussing the environmental impacts of each alternative). For example, Federal Defendants found the alternatives' impacts on wildfire were similar and thus discussed the alternatives collectively on this aspect. See AR036749-51. However, Federal Defendants separately discussed the unique effects of the individual alternatives on streams occupied by the Rio Grande Cutthroat Trout. See AR036703-04. Therefore, Federal Defendants did take a "hard look" at the environmental impact of each of the alternatives. See Colorado Envtl. Coalition, 185 F.3d at 1174.

Federal Defendants engaged in an intensive collaboration process from early 2006 through late 2007 by hosting 38 public meetings and workshops, attending many field trips, and speaking with many individuals personally. See AR36529. The meetings generated approximately 1,100 letters from the public. See id. Federal Defendants reviewed each letter and categorized the

comments submitted.   See id.   There were general comments which Federal Defendants addressed collectively where the sentiments were similar.   See AR36530.   There were also comments which addressed a specific trail or route; these comments were titled "site specific comments."   See id.   Federal Defendants discussed their treatment of the site specific comments:

> The site specific comments numbered 1,348.  Staff on the five ranger districts considered each site specific comment to see whether the suggestion could be incorporated into an alternative.  Most suggestions were placed in one or more alternatives but some were not.  When district staff recommended the comment not be in any alternative they provided a reason why not. These reasons are found in the site specific database in the project record USDA Forest Service 2010g.

AR36530.

This extensive and arduous collaboration process demonstrates that Federal Defendants looked at the SFNF on a trail by trail, route by route level which clearly satisfies their burden to analyze reasonable alternatives.   There were infinite possible alternatives, but Federal Defendants analyzed a reasonable amount based "upon the nature of the proposed action and the facts of the case." See 46 FR 1802601, 1b ("When there are potentially [an infinite number] of alternatives, only a reasonable number of examples [] must be analyzed and compared in the EIS.  What constitutes a reasonable range of alternatives depends on the nature of the propos[ed] action and the facts in each case.").   Accordingly, the Court finds that Federal Defendants considered a reasonable range of alternatives in reaching the decision.

**III. Federal Defendants did Conduct a Proper Scientific Analysis of the Issue Prior to Reaching Each Decision**

The third prong of NMOHVA's argument is that Federal Defendants' scientific analysis of the issue was flawed.  This argument has three sub-issues.   The Court will address each in turn.

*A.   Federal Defendants Reasonably Concluded that More Trails Leads to More Damage*

19

NMOHVA alleges that Federal Defendants improperly assumed that more trails is synonymous with more damage, leading to the ultimate conclusion that limiting the use of more trails would prevent more damage.  NMOHVA contends there is no evidence to support this assumption.  Further, NMOHVA takes issue with the fact that Federal Defendants did not consider physically decommissioning the trails, just limiting their use.  NMOHVA argues that there is no evidence in the record that use of the trails contributes to any damage caused by the physical characteristics of the routes themselves (e.g. location, soil type, water crossing, etc).  Because the assumption about more trails equaling more damage was a key theory in the FEIS, NMOHVA claims that the FEIS and its recommendations were built upon clear errors of judgment.

There are two main reasons why it was appropriate for Federal Defendants to equate the amount of roads with the amount of damage.  First, Federal Defendants note that the record, specifically the wildlife report, demonstrates that wildlife is struck by motor vehicles and the smaller mammals often die as a result of these collisions.  See AR036708-09.  Further, the noise from motorized vehicles can disturb wildlife.  Id.  Federal Defendants point out that the wildlife report supports this presumption through field visits, surveys and scientific studies.  See id.  This type of evidence exceeds the requirements set out by the Tenth Circuit for evidence to validate recreational use in an EIS.  See Comm. to Save our Canyons v. Krueger, 513 F.3d 1169, 1179-80 (10th Cir. 2008) (stating that even anecdotal information such as staff observations and trail interviews can be sufficient to evaluate recreational use rates in an EIS).  Because there is damage to wildlife from motor vehicle use, it was reasonable for Federal Defendants to use mileage of routes as a proxy for damage to the environment.  The more miles of routes, the more opportunity for motor vehicle use, and thus the more potential for impact to wildlife.

Additionally, the FEIS does document the fact that soils and waters have been impaired by motorized use.  See AR036686(noting effects of erosion due to motor vehicle use); AR036688 (same) Again, given that motorized vehicle use was having a negative effect on erosion, Federal Defendants acted reasonably in assuming that more miles would equal more of a negative effect on erosion.  Further, this decision is one related to agency expertise and, therefore, is entitled to deference by this Court.  See Utah Envtl. Cong. v. Russell, 518 F.3d 817, 824 (10th Cir. 2008) ("Deference to the agency is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise.") (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989)).

     NMOHVA also argues that Federal Defendants were required to complete scientific studies of the area prior to including this estimation in the FEIS.  In support of this argument, NMOHVA cites to Kettle Range Conservation Group v. United States Forest Service, 148 F.Supp.2d 1107, 1125-27 (E.D. Wash. 2001).  The court in Kettle Range stated that the FEIS was flawed because certain studies should have been completed prior to the FEIS being published.  Kettle Range, 148 F.Supp.2d at 1127.  NMOHVA contends the FEIS here is similarly flawed because assumptions were made regarding environmental degradation but no surveys were done to see if these assumptions were accurate.  As a preliminary matter, the Court notes that Kettle Range is not binding precedent upon this Court.  Further, the court's reasoning in Kettle Range that studies must be completed prior to being included in the FEIS was predicated on Ninth Circuit case law which has been subsequently overruled by the Ninth Circuit itself.  See The Lands Council v. McNair, 537 F.3d 981, 990-94 (9th Cir. 2008) overruled on other grounds by American Trucking Ass'ns, Inc. v. City of L.A., 559 F.3d 1046, 1052 (9th Cir.2009) (holding previous case law requiring the agency to do on-ground analysis prior to publishing FEIS as

21

incorrect; and stating that as long as agency explains its methodology, backs conclusions with reliable evidence, and has not made a clear error in judgment, failure to complete this analysis does not make agency action arbitrary or capricious).  Accordingly, NMOHVA's argument that all studies were required to be completed prior to the publishing of the FEIS is not persuasive. Moreover, the Court finds that Federal Defendants did not act arbitrarily or capriciously in equating more mileage with more damage.

      *B.*    *Federal Defendants' Assumptions Regarding Harm to the Jemez Mountain Salamander (JMS) from Motor Vehicles did not run Contrary to the Evidence*

NMOHVA argues that Federal Defendants acted contrary to the evidence regarding potential dangers from motorized traffic to the viability of the Jemez Mountain Salamander ("JMS"). NMOHVA points to *The Cooperative Management Plan for the Jemez Mountain Salamander (Plethodon neomexicanus) on Lands Administered by the Forest Service* (hereinafter the "2000 Cooperative Management Plan") which states that the greatest threat to the JMS is wildfire and the magnitude of other effects is "minimal".  <u>See</u> AR000529 ("Currently, the greatest threat to the [JMS] is thought to be the potential for extensive [ ] fires.  The magnitude of other threats is considered minimal based upon our knowledge and their potential impacts and other protective measures already in place.").  NMOHVA argues that despite this report which Federal Defendants referenced during notice-and-comment, they assumed negative effects of motorized vehicle usage on the JMS and ultimately eliminated 60% of trails within the JMS's habitat.

Both Federal Defendants and the Intervenors correctly note that NMOHVA's reliance on the 2000 Cooperative Management Plan is unfounded because it expired in 2010, and its findings were superseded by the 2010 comments of the New Mexico Endemic Salamander Team ("NMEST") which were incorporated into the FEIS.  The 2010 comments of the NMEST documented the various negative effects that motorized vehicle trails may have upon amphibians

in the forest.[7]  These findings were incorporated into the Biological Evaluation for NEPA as part

of the Travel Plan, and ultimately into the FEIS.  NMOHVA makes no argument regarding the

NMEST's 2010 opinions, and instead simply relies upon the outdated 2000 Cooperative

Management Plan.  Federal Defendants possessed the discretion to rely upon the best available

scientific opinions of its own experts provided such opinions are not arbitrary or capricious.  See

Utahans for Better Transp., 305 F.3d1152, 1182 (10th Cir. 2010) (noting that agencies may rely

upon the best available scientific information when assessing environmental impacts); see also

Custer, 256 F.3d at 1036 ("agencies are entitled to rely upon their own experts so long as their

decisions are not arbitrary and capricious.") (citation omitted).  Federal Defendants were not

required to rely upon the expired study and in fact, might have committed error had they done so.

The best and more current science demonstrates that the JMS was being harmed by motor

vehicle use.

NMOHVA also argues that Federal Defendants acted arbitrarily because they left open

some trails that NMEST designated as part of the JMS habitat.  Essentially, NMOHVA asserts

that if protection of JMS was really an important issue, Federal Defendants would have shut

down *all* trails that ran through JMS habitat and their failure to do so demonstrates that there was

not a rational basis for shutting down *any* trails in the JMS habitat.  However, Federal

---

[7]  See AR021865 (stating "on steeper slopes where JMS were most likely to occur, rutting and erosion were occurring, with trenching up to several feet deep and wide. This magnitude of habitat degradation likely fragments habitat and further isolates local populations, and potentially causes direct mortality of individual JMS."). The 2000 Cooperative Management Plan identified threats to the JMS such as ground disturbance, vegetation modification, suppression of its prey (AR000524), and also stated that increased roads and traffic cause soil compaction, alter surface conditions, increase erosion, and decrease litter depth and soil moisture (AR000525). The 2000 Cooperative management plan also warned that road construction through JMS populations would have negative effects because vehicle vibration would disturb the ground surface and cut the JMS off from underground retreats. (AR000526). In the FEIS FEDERAL DEFENDANTS also found that prohibiting people from driving near water would benefit amphibian species. (AR036717). It also found that cross-country travel related to dispersed camping and big game retrieval disturbed the JMS by "increase[ing] ground disturbance increasing fragmentation of wildlife habitat, and increase[ing] disturbance to wildlife species through increased motorized use," especially in areas occupied by the JMS because it " . . . facilitat[es] the removal of surface logs used by salamanders, compact[s] soil, and turn[s] (disturb[s]) the surface habitat." AR036728.

Defendants were attempting to satisfy a number of competing goals in this project.   While minimizing impact to the JMS was one of many goals, elimination of any and all harm to the JMS was not.   The fact that some trails remained open in JMS habitat simply demonstrates that concern for the JMS gave way to one of the plethora of other considerations impacting the agency's decision.   The fact that the Federal Defendants did not frame their decision solely in terms of impact to the JMS is not reversible error.

C.      <i>Federal Defendants did not Violate 50 C.F.R. § 1502.9(b)</i>

NMOHVA alleges that Federal Defendants violated 50 C.F.R. § 1502.9(b) by failing to respond to an opposing view offered during public comment.  <u>See</u> 50 C.F.R. § 1502.9(b) ("The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.").   NMOHVA's argument on this point clearly fails, a fact which NMOHVA itself seems to acknowledge because it did not even attempt to revive this claim in its reply brief after Federal Defendants demonstrated the lack of merit to this claim.

The draft EIS indicated that Federal Defendants assumed environmental impacts were the same for roads and trails.   However, during public comment, Federal Defendants were directed towards an article (Gaines et. al. 2003) which states that roads and trails have significantly different effects on wildlife.   Based on the FEIS, it is apparent that Federal Defendants' assertion was that both roads and trails cause the same <i>types</i> of damage (erosion, reduced plant cover, and other effects), but not necessarily the same <i>magnitude</i> of damage.   <u>See</u> AR036588 (citing Stokowski and LaPointe 2000); <u>see</u> <u>also</u> AR03614. Thus, Federal Defendants did in fact respond to the comment in the time between the draft EIS and the FEIS, by clarifying that they assumed the same <i>type</i> of impacts but not the same <i>magnitude</i>.  <u>Compare</u> AR016316 (Assumption 6)

24

(detailing the approach taken in the DEIS) <u>with</u> AR036598 (Assumption 6) (clarifying in the FEIS that the assumption was that the same type of effects existed between roads and trails but not the same magnitude); <u>see</u> <u>also</u> AR029113-14 (detailing similar *types* of effects between roads and trails).    Accordingly, Federal Defendants did comply with 50 C.F.R. § 1502.9(b) by clarifying their assumptions to square with the Gaines et. al. 2003 study.[8]    Therefore, this contention does not amount to any error at all, let alone reversible error.

### Conclusion

Petitioner has failed to show that Federal Defendants violated NEPA when reaching the decision at issue in this matter.  First, Federal Defendants reasonably used the estimated amount of trails actually being utilized by the public as the baseline for the no-action alternative. Second, Federal Defendants sufficiently analyzed a reasonable range of alternatives. Third, Federal Defendants' reasoning was scientifically sound. Finally and most importantly, Federal Defendants' actions do not violate any of the five situations mentioned by the Supreme Court to mandate a ruling that the agency action in question was arbitrary and capricious. <u>See</u> <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,</u> 463 U.S. 29, 43, (1983).

Federal Defendants relied upon the purpose and need of the 2005 Travel Rule in developing, studying and choosing an alternative, thereby considering the factors Congress intended for the agency to consider. Their findings do not run contrary to the evidence. Finally, they offered an explanation that is plausible in light of the evidence, as well as the purpose and needs of the Travel Rule.

---

[8]  There is also a viable argument that NMOHVA waived the argument that Federal Defendants violated 50 C.F.R. § 1501.9(b) by failing to raise this argument in its initial Petition.

**THEREFORE, IT IS ORDERED** that NMOHVA's Petition for Review of Agency Action **(Doc. No. 1)** is DENIED and this appeal is hereby dismissed.  The Court shall enter a separate judgment consistent with this Opinion.


_____
UNITED STATES DISTRICT JUDGE